UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| CHRISTOPHER SEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:17-cv-04050-SLD-JEH |
| | ) |
| ILLINOIS GAMING BOARD, MARK | ) |
| OSTROWSKI, KAREN WEATHERS, | ) |
| FRANK SPIZZIRI,[1] FRANK | ) |
| CONTRERAS, and SEAN BRANNON, | ) |
| | ) |
| Defendants. | ) |

ORDER

Before the Court is Defendants'[2] Motion for Summary Judgment, ECF No. 20. For the reasons that follow, the motion is GRANTED.

**BACKGROUND[3]**

Defendant Illinois Gaming Board ("IGB") administers the riverboat and video gambling systems in Illinois. *See* 230 ILCS 10/5. The IGB is authorized by law to use the services of the Illinois State Police ("ISP") to fulfill its responsibilities. *See id.* 10/5(d). At the times relevant to this suit, Defendant Frank Spizziri was a captain with the ISP who was assigned to the IGB, serving as Deputy Administrator of Enforcement. In that position, Spizziri was the commander for all of IGB's sworn law enforcement officers. Defendant Sean Brannon was a lieutenant

---

[1] Defendants spell Frank Spizziri's last name as "Spizzirri," but the Court uses the spelling from the Amended Complaint, ECF No. 7.
[2] Although the motion purports to be brought by the individual Defendants only, the Court presumes that Defendant Illinois Gaming Board ("IGB") is also a party to the motion because all Defendants are represented by the same attorneys and the motion presents an argument for summary judgment on a claim that is brought against the IGB.
[3] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The facts related here are, unless otherwise noted, taken from Defendants' statement of undisputed facts, Mem. Supp. Mot. Summ. J. 3–30, ECF No. 21; from Plaintiff Christopher See's disputed material and immaterial facts and additional material facts, Resp. Mot. Summ. J. 4–14, ECF No. 27; from Defendants' reply thereto, Reply 1–10, ECF No. 30; and from the exhibits to the filings.

employed by the ISP assigned to the IGB as an Operations Supervisor. Brannon was responsible for the oversight of five casinos and reported directly to Spizziri. Defendant Frank Contreras was a sergeant employed by the ISP and was assigned as docksite (another name for casino) supervisor at Jumer's Casino in Rock Island, Illinois. As supervisor of Jumer's, Contreras was responsible for overseeing IGB and ISP officers assigned to that casino.

Plaintiff Christopher See is a sworn law enforcement officer with the IGB who works as a Gaming Special Agent at Jumer's. As an officer with the IGB, See ensures the integrity of gaming in Illinois. He investigates criminal activity related to gambling and takes appropriate law enforcement action when necessary. See's claims relate to events that occurred over a two-week period in August 2016 around the time that he submitted a grievance to the IGB.

## I.     Events Relating to See's Grievance

See was a union steward. On July 20, 2016, he emailed Defendant Karen Weathers, an equal employment opportunity officer with the IGB, complaining that there was a conflict of interest between IGB and ISP employees. He alleged that the IGB, influenced by the ISP and ISP's union, interfered with IGB employees' "upward mobility" because the IGB promoted ISP employees at a higher rate than IGB employees. July 20, 2016 See Email, Mem. Supp. Mot. Summ. J. Ex. 9A, ECF No. 21-19. He indicated that he was investigating this issue for a possible grievance. As part of this investigation, he requested documentation of any similar past grievances. He also requested documentation regarding IGB employee Michael Miroux's alleged demotion from the position of Jumer's docksite supervisor.

Weathers responded to See's July email, explaining that Miroux had voluntarily agreed to return to his previous position. She provided information regarding one past grievance, which had been resolved at arbitration, that complained that the IGB was seeking to fill IGB positions

with ISP officers. In their summary judgment motion, Defendants provided evidence that other IGB employees had complained about ISP officers being assigned to work for the IGB in the past as well. For instance, IGB employee Sam Rossi filed several grievances related to the issue.

## II. Events Leading to This Suit

See went on vacation on July 30, 2016. He was scheduled to be off work through August 16, 2016. On August 8, 2016, he emailed Spizziri and Weathers from his personal email account. He indicated that he would be filing a grievance, which he attached to the email, in the next few days. He had prepared the grievance on Miroux's behalf, but two to three weeks prior to filing, Miroux told See he no longer wanted to proceed with the grievance. See decided to file the grievance anyway on behalf of every gaming agent employed by the IGB. The grievance attached to the email was seventy-nine pages long and suggested that the IGB, through Defendant Mark Ostrowski, Administrator of the IGB, was granting the ISP "de facto control" over the IGB. Statement of Grievance 1, Compl. Ex. 1, ECF No. 1-1.[4] See complained about the practice of hiring ISP law enforcement agents for IGB positions and suggested that ISP employees accounted for a larger percentage of IGB leadership positions than IGB employees. He also complained about corruption in Illinois generally and the IGB specifically.

In the August 8 email, See wrote that Richard Gesiorski—See's direct supervisor at Jumer's—was "spreading false rumors about [his] wife and [him], in retaliation for the filing of th[e attached] grievance." Aug. 8, 2016 3:48 P.M. See Email, Mem. Supp. Mot. Summ. J. Ex. 9-C, ECF No. 21-21. See wrote that his "wife [wa]s scared and [he] fear[ed] further retaliation" and asked the recipients of the email to "please put a stop to any and all retaliation and false rumors." *Id.* See sent a second email on August 8, this time copying Contreras. See wrote in

---

[4] The Amended Complaint cites to the original Complaint's exhibits. *See* Am. Compl. ¶ 19.

3

this email that his "wife [wa]s now afraid" and asked for help. Aug. 8, 2016 4:58 P.M. See Email, Mem. Supp. Mot. Summ. J. Ex. 9-D, ECF No. 21-22. Spizziri responded, asking See to send his phone number so that Spizziri could call him. See responded, saying: "My wife and I need help and my wife is seriously afraid. Can you please help us?" Aug. 8, 2016 5:37 P.M. See Email, Mem. Supp. Mot. Summ. J. Ex. 2-B, ECF No. 21-4. He again indicated that Gesiorski was spreading false rumors about him. After receiving this email, Spizziri was concerned about See. *See* Spizziri Dep. 33:11–13, Mem. Supp. Mot. Summ. J. Ex. 5, ECF No. 21-14. Spizziri did not normally receive emails asking for help like the one See sent.[5]

Later, Spizziri and See spoke on the phone. Spizziri's interpretation of the conversation was that See and his family were afraid that the ISP might harm them. *See, e.g.*, Spizziri Dep. 38:5–9 ("I remember that in our conversations my interpretation was that he was afraid . . . .").[6] See complained about widespread corruption within the IGB, ISP, and Illinois state government. This was concerning to Spizziri; he thought this was irrational.[7] The next morning, See sent Spizziri another email. He stated that he and his wife were being subjected to "malicious and false rumors" which were being spread as "'scare tactics,' in order to intimidate and scare" them. Aug. 9, 2019 8:46 A.M. See Email 1, Mem. Supp. Mot. Summ. J. Ex 2-C, ECF No. 21-5. He

---

[5] See indicates that "Spizziri's suggestion that somehow [the email] suggested that See was mentally unstable is not supported by any objective reading of the email." Resp. Mot. Summ. J. 5. See does not, however, point to evidence that Spizziri did not genuinely believe the email was concerning. And, moreover, the Court does not agree that concern for See's mental stability was objectively unreasonable based on the content of the email.

[6] Again, See states that "[t]he suggestion that [he] was somehow afraid is in no way supported by any evidence." Resp Mot. Summ. J. 5. He indicates that "there is no suggestion that [he] indicated that he was personally afraid of his physical safety." *Id.* However, Spizziri's testimony was about his interpretation of the conversation. It is undisputed that See never expressed that he personally feared any harm from the ISP. But See points to no evidence to suggest that this was not Spizziri's genuine interpretation of their conversation.

[7] See argues that "[t]he suggestion that a person alleging that there was corruption at the State of Illinois is irrational is a troubling statement." Resp. Mot. Summ. J. 5. He submits that Spizziri's statement "has no basis in fact." *Id.* However, this is Spizziri's testimony of his opinion and it is not being relied upon for the truth of whether there is actually corruption in Illinois state government. See also suggests that this statement "demonstrates that Spizziri['s] anger with See was directed at the fact that See had the audacity to complain about corruption." *Id.* at 5–6. But this is not a reasonable inference the Court can draw from Spizziri's statement that he thought See's comments were concerning and irrational.

4

indicated that his wife "believe[d] the [ISP] may even actually try and send someone to physically harm [thei]r family." *Id.* He wrote that his family was "counting on [Spizziri] to put an end to the retaliation and false rumors about" them. *Id.* at 2.

Spizziri was alarmed when he received this email. He was concerned for See's mental stability. *See* Spizziri Dep. 56:13–18 ("Q. Okay. You thought you needed to investigate his allegations, but did you think that he was mentally unstable? A. I was concerned. I was just concerned. I didn't know exactly what was going on. I was concerned."). He was also concerned that See might harm his wife.[8] Prior to these incidents, Spizziri had been informed that Gesiorski was concerned about See. Gesiorski told Spizziri that he thought See might act out to protect his family. Spizziri testified that, at first, he did not believe Gesiorski. But he became more concerned once See reached out to Spizziri directly for help.[9]

Spizziri had a conversation with IGB's General Counsel on August 9, 2016. Later that day, Spizziri, the General Counsel, Weathers, and a few others met to discuss See's emails. Spizziri sent an email to Ostrowski summarizing the meeting and the events leading up to it. Spizziri explained that See alleged fear for his family's safety and accused some IGB staff of retaliation and that "[t]here [wa]s a consensus that [See] may need to be evaluated for fitness for duty" and placed on administrative leave when he returned from vacation. Aug. 9, 2016 Spizziri Email, Mem. Supp. Mot. Summ. J. Ex. 2-D, ECF No. 21-6. Ostrowski instructed Spizziri to proceed with the team's suggested course of action.

---

[8] See disputes this by arguing that "[t]his statement is absolutely ridiculous." Resp. Mot. Summ. J. 7. Again, this is Spizziri's interpretation of events and See points to no evidence that this interpretation was not genuine.
[9] See disputes Spizziri's testimony by merely claiming that it is not credible. Resp. Mot. Summ. J. 8. "The Seventh Circuit has repeatedly explained that a party cannot raise a genuine issue of fact by merely suggesting that a jury might not believe the testimony offered by the opposing party." *Captain v. ARS Nat'l Servs., Inc.*, 636 F. Supp. 2d 791, 795 (S.D. Ind. 2009) (citing cases).

Spizziri talked with See's wife on the phone the next day. He also spoke with See and they agreed that See's allegations would be looked into after his vacation. The following day, however, See went to Jumer's at 6:45 A.M. in order to file the grievance formally. See emailed his grievance to Weathers, Spizziri, and Contreras at 6:52 a.m. At 7:00 a.m., Contreras arrived at Jumer's. See submitted the grievance to Contreras in person. Afterward, Spizziri called Contreras's office and, on speakerphone, asked See to leave.

Spizziri then drove to Jumer's. He asked Brannon to meet him there. Brannon and Spizziri spoke to those who were present when See came to Jumer's. They related that there had been an argument between Contreras and See in Contreras's office. Spizziri decided to put See on administrative leave immediately in light of his unexpected visit to work. *See* Spizziri Dep. 141:1–3 ("[W]e didn't want to risk the fact – we didn't want to risk him coming back and harming anybody."). Spizziri tried to call See to let him know, but could not reach him. Spizziri and Brannon decided to visit See at his home in Bettendorf, Iowa, but contacted the local police department beforehand because they were not within their jurisdiction. Brannon and Spizziri informed Bettendorf police officers that See was an employee on vacation who had "for unknown reasons . . . gone to the Jumer's Casino . . . with a multi-page document indicating that there was some type of corruption" and that they "believed that [See] was paranoid for unknown reasons and they were concerned about his mental state." Lt. Poirier Narrative Report 1, Resp. Mot. Summ. J. App. 142, ECF No. 27-6 at 6.

Bettendorf detectives offered to go to See's home to check on him and give him a memorandum notifying him that he was being placed on paid administrative leave effective immediately. The memorandum stated that the recent statements See had made "caused . . . concern about [his] ability to perform as a Gaming Special Agent." IGB Mem., Mem. Supp.

6

Mot. Summ. J. Ex. 12, ECF No. 21-32. Specifically, the memorandum noted, See had "expressed concerns that the Illinois State Police may try and send someone to physically harm [his] family." *Id.* The memorandum noted that the leave would extend until See completed a fitness-for-duty examination, which the IGB was scheduling. Bettendorf police collected See's service weapon.

The fitness-for-duty examination was conducted on August 22, 2016. See was found fit for duty. The IGB received the doctor's report of the examination on August 31 and See was notified on September 8 that he would be returned to work effective September 12. See is not the only IGB employee who has been placed on administrative leave and required to undergo a fitness-for-duty evaluation. For example, an ISP trooper assigned to work for the IGB was referred for a fitness-for-duty examination after his supervisor informed Spizziri about troubling statements the trooper made. This trooper was found fit for duty and returned to work.

See filed suit on February 10, 2017. Compl., ECF No. 1. He later amended his complaint. *See* Am. Compl., ECF No. 7. After two more amendments, *see* Nov. 29, 2017 Text Order; Nov. 16, 2018 Text Order, only two claims remain: a First Amendment retaliation claim against Defendants Ostrowski, Weathers, Spizziri, and Brannon,[10] *see* Am. Compl. ¶¶ 57–66; and a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, against the IGB, *see* Am. Compl. ¶¶ 75–79.

## DISCUSSION

I. **Legal Standard**

Summary judgment "is the put up or shut up moment in a lawsuit." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quotation marks omitted). It is

---

[10] See has conceded that he cannot establish a claim against Contreras. *See* Resp. Mot. Summ. J. 25.

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the non-movant fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). A party asserting that a fact is genuinely disputed must support its assertion with particular materials in the record. Fed. R. Civ. P. 56(c)(A). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

**II.    Analysis**

Defendants move for summary judgment on both of See's claims. Mot. Summ. J. 1–2. First, they argue that See cannot establish a genuine issue of fact as to his First Amendment retaliation claim and that the individual Defendants are entitled to qualified immunity on the First Amendment claim. *Id.* Second, they argue that requiring See to submit to a fitness-for-duty examination did not violate the ADA. *Id.* at 2.

### a. First Amendment Retaliation

A plaintiff must establish three elements to prove a First Amendment retaliation claim in the employment context. *Graber v. Clarke*, 763 F.3d 888, 894 (7th Cir. 2014).

> First, the plaintiff must show that his speech was constitutionally protected. Second, the plaintiff must prove that he suffered an adverse employment action as a result of his protected speech that was sufficiently adverse so as to deter the exercise of the free speech. And third, the plaintiff must present evidence to establish that a reasonable jury could find that his speech was a substantial or motivating factor for his adverse employment action.

*Id.* (citations and quotation marks omitted). The Court focuses on the third element as it is dispositive in this case. For purposes of this motion, then, the Court presumes that See engaged in constitutionally protected speech when he submitted his grievance document, *see* Resp. Mot. Summ. J. 17, ECF No. 27, and that he was subjected to an adverse action when he was subjected to a "campaign of petty harassment," *id.* at 21.[11]

To establish the third element of a First Amendment retaliation claim, a plaintiff must show that his speech was a substantial or motivating factor for the adverse action. *Graber*, 763 F.3d at 894. If a plaintiff can make this showing, "the burden shifts to the defendant to show that the harm would have occurred anyway." *Thayer v. Chiczewski*, 705 F.3d 237, 251–52 (7th Cir. 2012) (quotation marks omitted). "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered

---

[11] Defendants argue that See's claim is that he was subjected to two discrete adverse actions: being placed on paid administrative leave and being subjected to a fitness-for-duty examination. Mem. Supp. Mot. Summ. J. 36. They argue that neither of these are sufficiently serious to constitute an adverse action. See, by contrast, suggests that he is complaining of a pattern of behavior—these two actions in addition to having the police sent to his home—that together constitutes an adverse action. Resp. Mot. Summ. J. 21–22. The Court need not resolve this dispute.

9

reason was pretextual and that the real reason was retaliatory animus." *Id.* at 252. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id.* (quoting *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011)). See argues that his complaints of corruption were the cause of his harassment. Resp. Mot. Summ. J. 23. Defendants argue that See's statements that he was afraid of retaliation and that his wife feared that the ISP might send someone to physically harm their family concerned them and led to them sending the police to See's house, placing him on paid administrative leave, and requiring him to undergo a fitness-for-duty examination. Mem. Supp. Mot. Summ. J. 37–39, ECF No. 21. See suggests that Defendants' concerns were "concocted in an effort to avoid liability." Resp. Mot. Summ. J. 24.

Initially, the Court finds it questionable whether See could even meet his initial burden of showing that his protected speech was a motivating factor. A "motivating factor" is one that is a "sufficient condition" to cause the adverse action. *Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011) (quotation marks omitted). "A sufficient condition is something that, if it is present, something else is bound to happen . . . ." *Id.* Defendants argue that See has no evidence other than suspicious timing to suggest a link between his grievance and the alleged harassment. Mem. Supp. Mot. Summ. J. 37; *see Mullin v. Gettinger,* 450 F.3d 280, 285 (7th Cir. 2006) ("[T]he fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation."). See makes no specific argument as to what evidence shows that the grievance itself—and his complaints of corruption within it—was a motivating factor, as opposed to the surrounding circumstances of how he submitted his grievance. Instead,

10

his analysis appears to focus on whether Defendants have met their burden "to show that the harm would have occurred anyway," *Thayer*, 705 F.3d at 252 (quotation marks omitted), and on how implausible Defendants' proffered explanations are. *See* Resp. Mot. Summ. J. 23–25.

Even assuming See could meet this initial burden, the Court finds that Defendants have met their burden to show that they would have taken the complained of actions even absent the protected speech.[12] Defendants' position is that See's repeated pleas for help, reference to scare tactics and intimidation, and statement that his wife feared the ISP would send someone to harm their family are why they took the complained of actions. Concern about an employee's safety and ability to perform his job can be a legitimate, non-retaliatory reason for taking action. *Cf. McMilliman v. County of McHenry*, 893 F.3d 422, 431 (7th Cir. 2018) ("[D]efendants argue that Milliman would have been fired anyway because they honestly believed, based upon Dr. Grote's psychological report, that Milliman was unfit to perform his duties. Plaintiff does not dispute that defendants have met their burden.").

Spizziri testified that he was concerned by See's requests for help and other statements made in his emails and phone calls. The documentation of the meeting held with IGB's General Counsel and the memorandum notifying See that he was being placed on administrative leave confirm that Defendants were concerned about See. Additionally, Defendants have produced evidence that others have filed grievances similar to See's in the past, but have not been placed on administrative leave or required

---

[12] Put differently, Defendants have shown that if See had made the same concerning statements asking for help and indicating that his wife was scared that the ISP might try to harm their family in an email unconnected to any protected speech or grievance, they would have had the same concerns and required See to undergo a fitness-for-duty examination.

to complete a fitness-for-duty examination.  Here, it is even undisputed that people within the IGB, including Weathers, were aware that See was pursuing this grievance before he filed it.  No action was taken against See, however, until he made the concerning statements in the emails and phone call.  Defendants have also produced evidence that another employee was placed on administrative leave and required to undergo fitness-for-duty testing after he made troubling statements.

See's main argument is that the evidence supports finding that Defendants' proffered reason—their concern over See's fitness for duty and safety—was pretextual, or "concocted in an effort to avoid liability." Resp. Mot. Summ. J. 24; *see id.* ("A jury could look at this and conclude that this was merely a fabrication on Spizziri's part to justify his actions.").  But he does not set forth any evidence from which a jury could find that the proffered reason was "a lie." *Zellner*, 639 F.3d at 379.  When "assessing a plaintiff's claim that an employer's explanation is pretextual, [the court] do[es] not . . . second guess[] an employer's facially legitimate business decisions." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quotation marks omitted).  "An employer's reasons for [taking action against] an employee can be 'foolish or trivial or even baseless,' as long as they are 'honestly believed.'" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)).

See speculates that Spizziri lied about having these concerns, but points to no evidence to support such a finding.  He also makes numerous arguments regarding how a jury could find that the concerns were a cover up for the real reason he was put on leave and subjected to a fitness-for-duty examination: because he deigned to complain about

corruption in the IGB. But every argument relies on speculation and unreasonable inferences. For instance, See suggests that the Bettendorf police officers' report "indicates that [Defendants] thought he was paranoid because he had the audacity to claim that the IGB and the ISP had engaged in corruption" because the report does not "suggest that See posed some sort of danger" to others. Resp. Mot. Summ. J. 23. But the report merely states that Spizziri and Brannon "believed that Mr. See was paranoid for unknown reasons and they were concerned about his mental state." *See id.* (quoting Lt. Poirier Narrative Report 1). That the report does not specify the reasons Spizziri and Brannon thought See was paranoid does not reasonably suggest that they were retaliating against him for filing a grievance.

See also points to his own testimony that he never said that he was personally afraid of the ISP physically harming him or his family. *See id.* at 24. He suggests that he was merely passing on his wife's concerns. *Id.* (arguing that "the only thing that [Defendants] can point to [in support of their claim that See feared for his own safety] is See's statement that his wife was afraid"). But the Court does not find this distinction material. Spizziri testified that the impression he got from his call with See was that See and his family were afraid that the ISP might harm them. The Court was provided with no evidence that See told Spizziri that he was just passing on his wife's concerns; rather, he repeatedly told Spizziri that his wife was afraid and that they both needed help. Spizziri had not received this type of communication before. It was not patently unreasonable for Spizziri to conclude that this behavior was strange and concerning. See can point to no evidence which shows that Spizziri did not honestly have these concerns. And while See may think Spizziri was overreacting—or that his conclusion was "foolish .

. . or baseless," *Culver*, 416 F.3d at 547—that does not suggest that Spizziri's concerns about See's mental well-being and fitness for duty were pretext for retaliation.

See has not properly rebutted Defendants' evidence regarding their reason for taking the complained of actions—that See's words and behavior were concerning to them—nor has he offered any evidence to suggest that this reason was a lie. Summary judgment is therefore appropriate on See's First Amendment retaliation claim.

### b. ADA[13]

An employer is prohibited from making certain medical examinations and inquiries under the ADA. *See* 42 U.S.C. § 12112(d)(1). For instance, an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4)(A). Defendants do not dispute that the fitness-for-duty examination qualifies as a medical examination, but argue that it was job-related and consistent with business necessity. Mem. Supp. Mot. Summ. 45. See argues that there is a genuine dispute of fact as to the reason he was required to complete a fitness-for-duty examination.

"[A] medical examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009). The Seventh Circuit has consistently found

---

[13] The ADA prohibits an employer from taking an adverse action against an employee on the basis of his disability. *See* 42 U.S.C. § 12112(a). Defendants argue that any such claim See has fails because he cannot establish that he was subjected to an adverse action. Mem. Supp. Mot. Summ. J. 44–45. See does not respond to this argument, instead focusing on his medical inquiry claim. Any claim based on an adverse action, then, is waived. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

psychological evaluations required by public safety agencies consistent with business necessity "when they are used to determine a worker's ability to perform work functions safely." *Freelain v. Village of Oak Park*, 888 F.3d 895, 903–04 (7th Cir. 2018) (citing cases); *Coffman*, 578 F.3d at 565 ("We have acknowledged that inquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees and the public at large." (quotation marks omitted)). Defendants contend that See's behavior concerned them and that because See is a sworn law enforcement officer with a service weapon, his well-being potentially affected the safety of others.

See does not dispute that, if honestly believed, concern regarding a public safety employee's mental well-being is a proper reason to subject the employee to a psychological evaluation. *See* Resp. Mot. Summ. J. 28 ("Defendants contend that this provision is liberally construed when public safety employees are involved. This, of course, is accurate, however, it doesn't mean that an employee can be referred for an illegitimate reason."). His argument is, again, that Spizziri "concocted a basis for the examination by claiming that See feared for his safety – which he didn't." *Id.* But, as explained above, See has no evidence to suggest that Spizziri is lying about his basis for concern. See sent repeated emails with abnormal pleas for help complaining about another individual spreading false rumors about him. He spoke with Spizziri on the phone and conveyed his wife's concern that the ISP would send someone to physically harm his family. Spizziri interpreted this conversation as meaning that See shared this concern. Spizziri found this behavior concerning and, because See is a law enforcement officer who carries a gun, Defendants determined that his fitness for duty should be examined before he returned to work. See's suggestion that Spizziri "concocted" his concern for See's mental well-being, *id.*, is nothing more than mere speculation.

## CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment, ECF No. 20, is GRANTED.

The Clerk is directed to enter judgment and close the case.

Entered this 24th day of June, 2019.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
